UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


RICHARD SLACK,                        )
                                      )
          Plaintiff,                  )
                                      )    Case No. 4:07CV01655
                                      )              RWS/FRB
                                      )
          v.                          )
                                      )
MICHAEL J. ASTRUE, Commissioner       )
of Social Security,                   )
                                      )
          Defendant.                  )


**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**


          This matter is on appeal for review of an adverse ruling
by the Social Security Administration.  All pretrial matters have
been referred to the undersigned United States Magistrate Judge for
appropriate disposition pursuant to 28 U.S.C. § 636(b).

**I.    Procedural Background**

          On November 23, 2004, plaintiff Richard Slack
("plaintiff") filed an application for disability insurance
benefits ("DIB") under Title II of the Social Security Act ("Act"),
alleging disability since July 25, 1997 due to back pain,
depression, and Lyme disease.  (Administrative Transcript ("Tr.")
at 82-84.)

1

Plaintiff's application was denied initially and upon reconsideration (Tr. 34-35; 56-63), and on April 28, 2005, he requested a hearing before an administrative law judge ("ALJ"). (Tr. 55.) On July 12, 2006, a hearing was held before ALJ James B. Griffith in Columbia, Missouri.[1]  (Tr. 441-78.) On October 18, 2006, ALJ Griffith issued his decision that plaintiff was not disabled as such is defined in the Act. (Tr. 11-16.) Plaintiff filed a Request for Review of the hearing decision, and on May 4, 2007, defendant Agency's Appeals Council denied plaintiff's request. (Tr. 2-4.) The ALJ's decision thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

### A. Plaintiff's Testimony

At the hearing, plaintiff was represented by attorney Dennis O'Dell. Plaintiff was born on July 29, 1950, and has a high school diploma and an associate's degree in Industrial Engineering. (Tr. 445.) Plaintiff could not recall when he received his associate's degree, but testified that it was sometime after he stopped working in 1995. (Tr. 450-51.) Plaintiff testified that he is single, and has no children. (Tr. 446.) He has a driver's license, and testified that he drove himself to the hearing. Id.

---

[1] The record indicates that plaintiff's insured status ended on December 31, 2000. During plaintiff's hearing, the ALJ advised plaintiff of this and instructed him to limit his testimony regarding his conditions to the time preceding this date. (Tr. 451.) Neither plaintiff nor his attorney objected to this limitation.

Plaintiff testified that he last worked in 1995 for Friday Canning Company as a tanker truck driver, hauling waste water away from the plant. Id. Plaintiff testified that this job occasionally required him to lift boxes, but he could not estimate their weight. (Tr. 446-47.) Plaintiff also testified that he did "drive away" work, which involved transporting vehicles from place to place. (Tr. 447.) This job required occasional lifting.[2] Id. The ALJ noted that the record indicated that, in 1994 and 1995, plaintiff worked for a company called Independent Media Group, Incorporated, but plaintiff could not remember this employer. (Tr. 448.) Plaintiff testified that, during the 15 years preceding December 1995, he also worked as a maintenance person at a motel, a job that required him to paint walls, remove trash, and perform other maintenance. Id.

Plaintiff testified that he lives in a one bedroom apartment, and has been making ends meet with Veterans' Administration ("VA") benefits. (Tr. 448-49.) Plaintiff testified that he is six feet, three inches tall, and weighs 260 pounds, which represented a 30-pound weight gain. (Tr. 449-50.)

Plaintiff served in the Army from 1969 to 1972, and received an honorable discharge. (Tr. 451.)

Plaintiff testified that he stopped working in 1995 due to depression, weakness, and fatigue caused by Lyme Disease. (Tr.

---

[2]Later in his testimony, plaintiff testified that he occasionally lifted ten pounds. (Tr. 458.)

452.) Plaintiff testified that he sought treatment through the VA, and that it took a while for the diagnosis of Lyme Disease to be made. Id. The ALJ indicated to plaintiff that he saw nothing in the record indicating that plaintiff had actually been diagnosed with Lyme Disease, and plaintiff stated that Lyme Disease was referred to a number of times in his medical records, and that he had been told that his symptoms were related to Lyme Disease. (Tr. 452.)

The ALJ then asked plaintiff whether his back caused him problems before December of 2000, and plaintiff testified that he suffered depression, and had significant fatigue and weakness, such that he would get tired after spending 90 minutes cleaning the house and have to lie down for 30 to 60 minutes. (Tr. 454, 456.) Plaintiff testified that he would have been unable to maintain this schedule of working for 90 minutes and resting for 30 to 60 minutes during an eight-hour workday because, at about 3:00 p.m., he would lie down and go to sleep, and remain asleep until the following day. (Tr. 456.) Plaintiff testified that he would have been unable to work for longer periods of time if he could work in a seated position. (Tr. 457-58.)

Regarding his ability to lift, plaintiff testified that, due to fatigue, he would have been unable to lift more than ten pounds on an occasional basis throughout an eight-hour workday. (Tr. 458.) Plaintiff testified that lifting would have exacerbated his fatigue, and shortened the amount of time he would have been

4

able to spend working.  (Tr. 459.)

Plaintiff testified that some of his medication caused him to have "suicidal effects".  Id.  Plaintiff testified that his depression was severe enough that it would have interfered with his ability to work on a regular basis, inasmuch as he was unable to focus; his energy level and motivation to accomplish things was negatively affected, and his sleep patterns were disrupted.  (Tr. 459-61.)  Plaintiff testified that his back problems were also severe enough to have kept him from working, and that he had to sleep in a chair because of back problems.  (Tr. 460-61.) Plaintiff testified that he still sleeps in a chair and in a bed, and that "it fluctuates all night long."  (Tr. 461.)

Plaintiff then described his typical day prior to December 2000.  Plaintiff testified that he would wake in the morning, make breakfast, go into town for a coffee, and return home to lay down for a while.  (Tr. 461.)  Plaintiff would get up and do a little bit of yard work, and then lay down again.  Id.  Plaintiff also watched TV, did housework, and made lunch.  (Tr. 461-62.) Plaintiff also testified that he also worked on his computer, doing research, studying, and reading.  (Tr. 462.)  Plaintiff was then asked whether he hunted or fished, and he testified that he did not.  (Tr. 463.)  After the ALJ noted that plaintiff had applied for a cross bow permit, plaintiff testified that he did apply for such a permit because he could no longer use a regular bow, and that he went small game hunting (rabbits and squirrels) with a .22,

and also went deer hunting. (Tr. 463-64.) Plaintiff denied any
other activities, and denied being a member of a church or other
organization. (Tr. 464.)

When asked how he got his meals, plaintiff testified that
he cooked for himself, and made "only the basics." Id. Plaintiff
testified that, if he did not make his own meals, he "didn't
bother." Id. The ALJ then noted that this was during a time when
plaintiff said he had gained weight and had been put on a diet by
a doctor, and plaintiff testified that his medication slowed his
metabolism and that he was physically inactive. Id. Plaintiff
testified that, during the relevant time, he did not smoke or take
drugs, and drank a six pack of beer once a month. (Tr. 465.)

Plaintiff testified that, from 1995 to 2003, he could
lift 25 pounds at most, and could walk about two blocks before he
had to sit down and rest due to fatigue. (Tr. 466.) Plaintiff
testified that he could stand for two hours at the most, but that
doing so would cause much fatigue. Id. Plaintiff testified that
he would have been able to sit for about the same amount of time.
Id.

The ALJ and plaintiff's attorney then had a discussion
regarding the lack of evidence in the record that plaintiff had
ever been diagnosed with Lyme Disease, and about plaintiff's
attorney's wish to leave the record open to investigate whether any
outstanding medical records would confirm plaintiff had been
diagnosed with Lyme Disease. (Tr. 467-70.) The ALJ agreed to hold

6

the record open for 30 days.  (Tr. 477.)

The ALJ then heard testimony from John F. McGowan, Ed.D., a vocational expert ("VE"). (Tr. 470.)  Mr. McGowan testified that he had reviewed plaintiff's file, and noted his work history. (Tr. 471.)  Mr. McGowan noted that plaintiff had income for only the first six of the past 15 years, and that income reflected work below the substantial gainful activity ("SGA") level.  Id.  Mr. McGowan testified that plaintiff's highest income was $4,135.00 in 1995.  Id.

Mr. McGowan classified plaintiff's past work as a truck driver as "truck driver light or drive away worker", and characterized the job as medium in strength, and that plaintiff's descriptions of his lifting limits would also be medium.  Id.  Mr. McGowan characterized plaintiff's maintenance work at the hotel as "maintenance man service", a medium-strength occupation with a specific vocational preparation ("SVP") of four, with transferability of skills limited to the same type of work performed in the same type of setting.  (Tr. 471-72.)

The ALJ then asked Mr. McGowan to assume a hypothetical worker with past relevant work of the truck driver job, drive away job, and maintenance job as described, and to assume the hypothetical worker was able to occasionally lift and carry 50 pounds and frequently lift and carry 25; was able to stand and/or walk for up to six hours, assuming normal breaks, but would be limited to only occasionally stooping on the job.  (Tr. 472.)  The

7

ALJ then asked Mr. McGowan whether such a person would be able to perform any of the past jobs described, and Mr. McGowan testified that the individual would be able to perform the truck driving job. Id. Mr. McGowan testified that such person could not perform the maintenance job. (Tr. 473.)

For his second hypothetical, the ALJ asked Mr. McGowan to assume the factors from the first hypothetical, but to assume the additional factors that the worker would be limited to understanding, remembering, and following simple instructions and directions, and work in a routine work environment. Id. Mr. McGowan testified that he interpreted such restrictions as an SVP of two, and the prior work would therefore be eliminated. Id. Mr. McGowan testified that such an individual would, however, be able to make a vocational adjustment to perform other work. Id. Mr. McGowan testified that examples of such work included unarmed guard work, classified as light or medium, for which there were 1,230 jobs in the local "zone", which he defined as 19 counties in central Missouri, including the county plaintiff was from. (Tr. 473-74.) Mr. McGowan further testified that plaintiff could perform routine assembly jobs, including those in the garment industry, and listed the specific jobs of cuff folder, stuffer, and assembly of small parts (but not electrical assembly). (Tr. 474.) Mr. McGowan testified that there were 690 hand worker jobs in the applicable zone, and 4,730 assembly jobs. Id.

The ALJ then asked Mr. McGowan a third hypothetical. Id.

8

He advised Mr. McGowan to assume all factors from the second hypothetical, but with a lifting restriction of no more than 20 pounds occasionally. (Tr. 474-75.) Mr. McGowan testified that this would not affect the two jobs he had just identified. (Tr. 475.)

Plaintiff's attorney then cross-examined Mr. McGowan, and asked him to assume an individual who would have to rest for 30 minutes after 90 to 120 minutes of work, and who could maintain that schedule until approximately 3:00 p.m., after which time he would be unable to work for the rest of the day. Id. Mr. McGowan testified that such an individual would be unable to perform plaintiff's past relevant work, or any of the direct entry-level work. (Tr. 475-76.)

Following the hearing, the ALJ agreed to hold the record open for 30 days to allow time to search for additional medical information regarding whether plaintiff had ever had a positive diagnosis for Lyme Disease. (Tr. 467-70; 477-78.)

B.   Medical Records

Records from the Veteran's Administration Hospital ("VA") indicate that plaintiff was seen on several occasions from February 3, 1995 to December 1995 with complaints of decreased tone and sensation on the right side of his face, and of confusion and disorientation. (Tr. 420-25; 440.) Plaintiff was referred to Neurology. (Tr. 440.)

Plaintiff presented to the VA medical clinic on March 12,

1996 with complaints of difficulty swallowing. (Tr. 418.) On this same date, plaintiff underwent a chest x-ray, which was negative for pulmonary disease. (Tr. 413.) An Esophogram performed on April 1, 1996 yielded normal results. (Tr. 412.)

On May 21, 1996, plaintiff underwent a Compensation and Pension Examination with David Wagner, M.D. (Tr. 189-90.) Plaintiff reported that he had begun experiencing right-sided numbness in 1994. (Tr. 189.) Plaintiff's February 1995 through December 1995 treatment was noted, and it is also noted that plaintiff sought treatment from a private clinic in December 1995 where he was diagnosed with Lyme Disease, but that records of this diagnosis and treatment were unavailable. Id. Dr. Wagner then wrote "[a]lthough no Lyme titers are available from December of 1995, the patient had a Lyme titer in 1992 of 1:256 and there are records of Lyme titers on February 22, 1996 where the Lyme titers were as follows: the LY poly was 1:256 and the LY IgM was less than 1:32." Id.

Plaintiff reported that the numbness on his right side had decreased, but that he had developed some numbness in his left hand which he particularly noted when he held a telephone. (Tr. 189-90.) Upon exam, Dr. Wagner found plaintiff to be alert and in no acute distress; well-nourished and well developed. (Tr. 190.) Plaintiff's exam was negative. Id. Dr. Wagner noted that a repeat Lyme titer was drawn and was pending. Id. Dr. Wagner opined that plaintiff had a "presumptive diagnosis of Lyme disease and was

10

treated for this in December of 1995", and also wrote "[a]s far as disability determinations for his neurologic complaints, the patient probably needs to have further evaluation in the Neurology clinic." Id.

VA clinic records dated June 1996 indicate that a Lyme titer test was performed, and indicated that "166 IB not detected." (Tr. 417.) The records further indicate that plaintiff was advised via telephone of these results. Id.

Plaintiff presented to the VA clinic on July 8, 1996 with complaints of low self-esteem and interrupted sleep patterns. (Tr. 415.) He had no suicidal ideation. Id. Upon exam, he was alert and oriented with an appropriate thought content, but had a flat affect. Id. The assessment was depression, and plaintiff was prescribed Zoloft[3] and Trazodone.[4] Id.

The VA clinic records indicate that plaintiff telephoned on July 12, 1996 to request a note stating that he was unable to work due to depression. (Tr. 414.) The record also indicates that plaintiff telephoned on March 10, 1997 to request a written statement from the doctor of his opinion of plaintiff's condition, explaining that he was amassing his medical records in conjunction with a military pension claim. (Tr. 409.)

---

[3]Zoloft, or Sertraline, is used to treat depression, anxiety, and other psychological disturbances.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a697048.html

[4]Trazodone is used to treat depression.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a681038.html

The record indicates that plaintiff underwent a neurological Compensation and Pension Evaluation on September 23, 1996 with M. Franczak, M.D. of the VA. (Tr. 187.) Plaintiff reported that he had been evaluated beginning in February 1995 for right face and arm weakness and numbness, and that there had been no diagnosis. <u>Id.</u> It is further noted that plaintiff had followed up with his primary care physician, who diagnosed him with Lyme Disease, and treated him with antibiotics for 21 days with some improvement of the fatigue, but no improvement of the weakness or numbness. <u>Id.</u> Plaintiff's current complaints were memory problems, chronic malaise, fatigue, and right-sided weakness and numbness. <u>Id.</u>

Upon exam, plaintiff was alert and oriented times three, and he had normal muscle tone and bulk. (Tr. 188.) Strength was 5/5 bilaterally, and he had some decreased sensation on the right side with some tingling on the right side of his face. <u>Id.</u> His deep tendon reflexes were somewhat diminished. <u>Id.</u> Dr. Franczak noted that plaintiff had a "history of Lymes Disease" [<u>sic</u>] with "minimal residuals including right face, arm and leg numbness, with normal motor strength while resting, although patient is complaining of subjective right lower extremity weakness." <u>Id.</u> Dr. Franczak recommended neuropsychology testing. (Tr. 188.) A handwritten note indicated that neuropsychology testing revealed low normal verbal, and borderline remote memory. <u>Id.</u> The remainder of the handwritten note is illegible. <u>See</u> <u>Id.</u>

12

Plaintiff returned to the clinic on September 30, 1996 with complaints of right sided weakness and numbness, stating that this was an effect of Lyme's Disease. (Tr. 411.) Upon exam, plaintiff was alert and oriented. Id.

The following year, on August 18, 1997, plaintiff returned to the VA clinic with complaints of right-sided weakness, but no significant change since his last appointment. (Tr. 407.) Exam was normal. Id. Plaintiff was assessed with superficial varicosities in his legs and told to wear compression stockings. Id. The clinician noted "Lyme's disease - stable", although there was no reference to any past or present diagnosis or testing. Id.

On January 23, 1998, plaintiff telephoned the VA clinic to report a green tint in his urine. (Tr. 405.) He denied other symptoms in his genitourinary or physical stature. Id. A urinalysis on January 26, 1998 was "completely normal." Id.

On February 18, 1998, plaintiff was seen in the VA clinic with complaints of fatigue and lack of motivation. (Tr. 406.) He was noted to appear lethargic; had a blunted affect and mood; and spoke in a low voice. Id. He had no suicidal or homicidal ideation. Id. Upon exam, he was alert and oriented, and his judgment, insight and memory were "ok". Id. He was diagnosed with dysthymia,[5] and an Axis III diagnosis of "Lymes disease" was noted.

---

[5]Dysthymia is a mood disorder characterized by a chronic mildly depressed or irritable mood. It is often accompanied by other symptoms such as eating and sleeping disturbances, fatigue, and poor self-esteem. http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=dysthymia

(Tr. 406.)  He was assessed with a Global Assessment of Functioning ("GAF") score of 55.  Id.  He was given Zoloft, Prozac,[6] and Trazodone.  Id.

On June 30, 1998, plaintiff presented to the VA clinic for follow-up and reported no significant changes, but did complain of GERD (gastroesophageal reflux disease) symptoms.  (Tr. 404.) Plaintiff was given Tagamet.[7]  Id.

On October 14, 1998, plaintiff returned to the VA clinic with complaints of low back pain, lethargy, and insomnia.  (Tr. 401.)  Lumbar spine films taken on this date showed degenerative changes and spur formation at L3-4, sclerosis and mild narrowing of the L3-4 disc space, with no evidence of spondylolisthesis.  (Tr. 402.)  Also on this date, plaintiff received a psychological evaluation, and it was noted that plaintiff had some psychomotor retardation. (Tr. 403.)  He had no suicidal or homicidal ideation. Id.  Plaintiff was advised to continue taking Prozac and Trazodone, and return in three months.  Id.

Plaintiff was seen again on November 2, 1998 and reported no difference in his mood.  (Tr. 400.)  He had no suicidal or homicidal ideation.  Id.  His medications were continued.  Id.

On December 17, 1998, nerve conduction studies and EMGs

---

[6]Prozac, or Fluoxetine, is used to treat depression, obsessive-compulsive disorder, some eating disorders, and panic attacks. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a689006.html

[7]Tagamet, or Cimetidine, is used to treat ulcers and GERD. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682256.html

were done of plaintiff's right upper and lower extremities. (Tr. 380.) The nerve conduction studies were normal, and the EMG examination revealed "patchy chronic changes" throughout the right upper and lower extremities, the clinical significance of which was unclear. Id.

On January 29, 1999, plaintiff returned to the VA with complaints of continued low back pain and weakness of the right leg. (Tr. 399.) Strength was 5/5 in all four extremities, nerve conduction studies were normal, and plaintiff had negative clonus and intact pedal pulses. Id. It was noted that an MRI revealed a small midline disc bulge at L2-3, with no evidence of radiculopathy or myelopathy. Id. It was noted that plaintiff was not a candidate for neurosurgical intervention. (Tr. 399.)

Plaintiff returned to the VA on March 30, 1999 for an eye exam. (Tr. 398.) He was given a prescription and advised to return in one year. Id. On this same date, plaintiff was also evaluated in the clinic and reported muscle soreness, insomnia and a weight gain of 13 pounds, and stated a desire to lose weight. Id.

On September 9, 1999, plaintiff presented to the VA clinic to be fitted for compression stockings. (Tr. 380.) On September 29, 1999, plaintiff returned to the medical clinic for a six-month follow-up appointment. (Tr. 397.) Upon exam, he was noted to be "doing fairly well." Id. His exam was normal, with no peripheral edema. Id. He was instructed to follow-up again in six

15

months.  Id.

Plaintiff also had a psychological evaluation on September 29, 1999. (Tr. 396.) He reported "doing ok." Id. His affect and mood were noted to be stable; he was well-groomed; and he had no suicidal or homicidal ideation. Id. Plaintiff was prescribed Prozac and Elavil[8] and advised to return in four months. Id.

On March 14, 2000, plaintiff returned to the clinic, and it was noted that he was "doing ok no change". (Tr. 378-79; 396.) Plaintiff reported feeling tired, but that he had no problems after he discontinued Amitriptyline (Elavil) and was losing weight. (Tr. 378.) Upon exam, he was well groomed; his affect and mood were stable; he had no suicidal or homicidal ideation; he was alert and oriented; and his cognition was intact. Id. It was noted that plaintiff was taking over-the-counter Melatonin, a sleep aid. (Tr. 396.)

On March 22, 2000, plaintiff was seen in the ophthalmic clinic and reported that he was working on the computer a lot, and that this caused eye tiredness and fatigue. (Tr. 395.) On this same date, plaintiff was seen in the clinic and reported having difficulty losing weight. (Tr. 379.) Plaintiff also reported generalized arthralgia secondary to Lyme's disease. Id. He had a flat affect, but fair judgment and a normal exam, and only minimal

_____

[8]Elavil, or Amitriptyline, is used to treat symptoms of depression. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682388.html

swelling in his lower extremities. Id. He was prescribed Amitriptyline (Elavil) and Fluoxetine (Prozac). Id.

On September 12, 2000, plaintiff returned to the VA for follow-up, and reported that he was doing ok. (Tr. 378.) He complained that the Amitriptyline (Elavil) was causing him to gain weight. Id. He stated that it was difficult to deal with Lyme's Disease, and that his neighbors were asking him why he was not working. Id. Upon exam, plaintiff was well groomed; his affect and mood were stable; he had no suicidal or homicidal ideation; his cognition was intact; and he was alert and oriented. Id. Plaintiff was advised to follow-up in six months. (Tr. 378.)

VA records indicate that plaintiff was seen on several occasions from 2002 through 2006 for treatment related to complaints of depression, hearing loss, vision loss, gastrointestinal upset, an inguinal hernia, and back pain. (Tr. 194-324.) The records indicate that plaintiff's back pain was treated conservatively (Tr. 310-13), and that he underwent hernia repair On September 11, 2003. (Tr. 342-52; 381-82.) A July 31, 2003 VA clinic note indicates that plaintiff telephoned the VA to inquire about filing for 100% disability. (Tr. 355.) He reported that he was receiving a VA pension of $800 per month and was barely able to make it on that, and that his home required repairs that he could not afford. Id. He mentioned that he had filed for social security disability, and voiced frustration with governmental agencies in general because they either denied his claims or were

slow in responding to him.  <u>Id.</u>

On January 6, 2005, a Psychiatric Review Technique form was completed by Anthony J. Matkom, Ph.D.  (Tr. 130-43.)  Dr. Matkom indicated that his assessment covered the period from July 25, 1997 through December 31, 2000.  (Tr. 130.)  Dr. Matkom diagnosed plaintiff with Dysthymia, and indicated that he had only mild restrictions in the areas of daily living and in maintaining social functioning; moderate limitations in the area of maintaining concentration, persistence or pace; and no limitations in the area of episodes of decompensation. (Tr. 140.)  On this same date, Dr. Matkom completed a Mental Residual Functional Capacity Assessment, indicating that plaintiff's last insured date was December 31, 2000.  (Tr. 144.)  The only moderate limitations Dr. Matkom found were in the areas of understanding and remembering detailed instructions and the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; and the ability to complete a normal work day and work week without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 144-45.)  In all other areas, Dr. Matkom found that plaintiff was not significantly limited, and indicated no areas of marked limitation.  <u>Id.</u>

On January 24, 2005, plaintiff presented to the audiology department at the VA with complaints of a buzzing sound in his ears.  (Tr. 323.)  It was opined that he may be a candidate for a

hearing aid, and he was instructed to follow up for a re-test in one to two years.  Id.

On March 17, 2005, state agency physician Mina Khorshidi, M.D., completed a Physical Residual Functional Capacity Assessment, noting that plaintiff's last insured date was December 31, 2000. (Tr. 119-126.)  Dr. Khorshidi found that plaintiff had no manipulative or environmental limitations, and could lift, carry, push or pull fifty pounds occasionally and twenty-five pounds frequently, sit six hours in an eight-hour day, stand or walk a total of six hours in an eight-hour day, occasionally stoop and frequently climb, balance, kneel, crouch and crawl.  Id.

A Psychiatric Review Technique form was completed by Keith Bauer, Ph.D. on March 22, 2005.  (Tr. 103-15.)  Dr. Bauer indicated that his assessment covered the period of time from July 24, 1997 through December 31, 2000.  (Tr. 103.)  Dr. Bauer opined that an RFC assessment was necessary, and indicated that plaintiff  had Dysthymia secondary to Lyme Disease.  (Tr. 106.)  Dr. Bauer indicated that plaintiff had mild limitations in his activities of daily living and in maintaining social function; moderate difficulty in maintaining concentration, persistence or pace; and no episodes of decompensation.  (Tr. 113.)

On this same date, Dr. Bauer also completed a Mental Residual Functional Capacity Assessment.  (Tr. 116-18.)  Dr. Bauer found that plaintiff was not significantly limited in all areas except for the ability to understand and remember detailed

instructions; the ability to maintain attention and concentration for extended periods; and the ability to perform activities within a schedule; maintain attendance; and be punctual. (Tr. 116-17.)

On June 27, 2005, plaintiff was seen by Jessica R. Nittler, M.D., a VA psychiatrist. (Tr. 269-71.) Plaintiff complained of a history of depression and low energy levels, but reported some improvement with low doses of Methylphenidate.[9] (Tr. 269.) Plaintiff reported beginning treatment for depression in 1996 "after having Lyme Disease" and it was noted that Ritalin helped his energy. Id. It was also noted that a sleep study done in Wisconsin did not reveal sleep apnea. Id. Plaintiff reported applying for SSI in Wisconsin, and that he received disability through the VA for Lyme Disease. (Tr. 270.) It was noted that plaintiff was counseled for smoking cessation. Id. Plaintiff's depression screening exam revealed that, in the past month, he had not often been bothered by depression or hopelessness, or experienced anhedonia. (Tr. 271.) Plaintiff was given Prozac and Mirtazapine,[10] and his Methylphenidate was restarted. (Tr. 270.) He was assigned a GAF of 50. Id.

On August 25, 2005, Dr. Nittler completed a Mental

---

[9]Methylphenidate (also known as Ritalin) is used as part of a treatment program for attention deficit hyperactivity disorder, and is also used to treat narcolepsy.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682188.html

[10]Mirtazapine (Remeron), is used to treat depression.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a697009.html

Residual Functional Capacity Questionnaire. (Tr. 277-81.) She indicated that she was "unable to assess" plaintiff's ability to function. <u>Id.</u> She further indicated that plaintiff had been depressed since suffering from Lyme Disease, and that his depression had become psychotic with auditory hallucinations. (Tr. 280.) Dr. Nittler was asked to define the "earliest date that the description of symptoms and limitations in this questionnaire applies", and she wrote "currently." <u>Id.</u>

**IV.        The ALJ's Decision**

The ALJ initially noted that, inasmuch as plaintiff was alleging disability since December 25, 1995, he was implicitly requesting reopening of his July 24, 1997 adverse Title II decision. (Tr. 11.) The ALJ denied this request because the time period for reopening had lapsed, citing 20 C.F.R. § 404.988. <u>Id.</u> The ALJ noted that the doctrine of <u>res judicata</u> therefore barred consideration of the period preceding July 25, 1997.[11] <u>Id.</u>

The ALJ further noted that plaintiff was not insured for Disability Insurance Benefits ("DIB") after December 31, 2000. At no point, either during the administrative proceedings, when plaintiff was represented by counsel, or during the proceedings before this Court, have the parties disputed the fact that

---

[11]Plaintiff herein alleges no error in the ALJ's determination that the doctrine of <u>res judicata</u> bars consideration of the time period preceding July 25, 1997.

plaintiff's insured status for DIB expired on December 31, 2000, or that his application for DIB was limited to the time preceding this date. The issue is therefore whether plaintiff was disabled within the meaning of the Act prior to that date. <u>Basinger v. Heckler</u>, 725 F.2d 1166, 1168 (8th Cir. 1984); <u>Dunlap v. Harris</u>, 649 F.2d 637, 638 (8th Cir. 1981).

The ALJ found that plaintiff had not engaged in substantial gainful activity during the July 25, 1997 to December 31, 2000 period, and that his ability to do basic work activities was more than minimally limited by degenerative disc disease, obesity and a dysthymic disorder during the period in question, and thus satisfied the requirement for a severe impairment. (Tr. 12.) The ALJ dismissed plaintiff's allegation of Lyme Disease "for want of a medically determinable impairment", writing that the medical record was void of evidence corroborating plaintiff's allegation. <u>Id.</u> The ALJ noted that a VA medical report from November 1995 showed that Lyme Disease was only considered probable for plaintiff, and June 1996 VA medical records indicating that plaintiff had a negative Lyme titer. <u>Id.</u>

The ALJ analyzed the medical evidence of record, and determined that plaintiff's condition did not meet or medically equal one of listing-level severity. <u>Id.</u> Citing <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1321-22 (8th Cir. 1984) and the relevant factors therefrom and, after applying the <u>Polaski</u> factors to the evidence of record, determined that plaintiff was not fully

22

credible.[12] (Tr. 12, 14.)   The ALJ determined that plaintiff had
the residual functional capacity ("RFC") to lift or carry 20 pounds
occasionally; sit for six hours in an eight-hour day; stand or walk
for six hours in an eight-hour day; occasionally stoop; and follow
simple instructions and directions in a routine work environment.
(Tr. 14.)

        The ALJ found that plaintiff had no past relevant work but
that, based upon credible VE testimony, plaintiff was able to
perform work existing in significant numbers in the national economy
throughout the July 25, 1997 to December 31, 2000 period.  (Tr. 14-
15.)   The ALJ concluded that plaintiff did not become disabled
during the July 25, 1997 to December 31, 2000 period, and was not
entitled to DIB benefits.  (Tr. 16.)


**V.   Discussion**

        To be eligible for supplemental security income under the
Social Security Act, a plaintiff must prove that he is disabled.
<u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001);  <u>Baker
v. Secretary of Health and Human Services</u>, 955 F.2d 552, 555 (8th
Cir. 1992).  The Social Security Act defines "disability" in terms

---

[12]In the "Findings" section of his decision, however, the ALJ wrote "The
claimant's allegations are fully credible for the period in question."  (Tr.
15.)  Because the ALJ, in the body of his decision, wrote that he found
plaintiff not fully credible, and discussed the evidence in the record that
led him to that decision, it appears that his statement on page 15 is merely a
typographical error.  <u>See</u> <u>Quaite v. Barnhart</u>, 312 F. Supp. 2d 1195, 1199-1200
(E.D. Mo. 2004) (whether misstatement is typographical error is to be
determined by reading misstatement in context of entire opinion.)  The
undersigned further notes that the parties do not note or challenge this
error.

of the effect a physical or mental impairment has on a person's ability to function in the workplace. See 42 U.S.C. §§ 423(d)(1)(A).

The Act provides disability benefits only to those unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." Id. It further specifies that a person must be both unable to do his previous work and unable, "considering his age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987); Heckler v. Campbell, 461 U.S. 458, 459-460 (1983).

To determine whether a claimant is disabled, the Commissioner utilizes a five-step evaluation process. See 20 C.F.R. § 404.1520; Bowen, 482 U.S. at 140-42. The Commissioner begins by considering the claimant's work activity. If the claimant is engaged in substantial gainful activity, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment

24

is not severe, then he is not disabled.  The Commissioner then determines whether claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's impairment is equivalent to one of the listed impairments, he is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant has the residual functional capacity to perform his or her past relevant work.  If so, the claimant is not disabled.  If not, the burden then shifts to the Commissioner to prove that there are other jobs that exist in substantial numbers in the national economy that the claimant can perform.  <u>Pearsall</u>, 274 F.3d at 1217, <u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (8th Cir.  2000).  Absent such proof, the claimant is declared disabled and becomes entitled to disability benefits.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence.  42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Young o/b/o Trice v. Shalala</u>, 52 F.3d 200 (8th Cir. 1995) (citing <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993)).  Substantial evidence is less than a preponderance but enough that a reasonable person would find adequate to support the conclusion.  <u>Briggs v. Callahan</u>, 139 F.3d 606, 608 (8th Cir. 1998).  To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ;

2.  The plaintiff's vocational factors;

3.  The medical evidence from treating and consulting physicians;

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;

5.  Any corroboration by third parties of the plaintiff's impairments;

6.  The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the plaintiff's impairment.

Stewart v. Secretary of Health and Human Services, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any "evidence which fairly detracts from the ALJ's findings." Groeper v. Sullivan, 932 F.2d 1234, 1237 (8th Cir. 1991); see also Briggs, 139 F.3d at 608. However, where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. Briggs, 139 F.3d at 608; Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992)(citing Cruse, 867 F.2d at 1184).

In the case at bar, plaintiff is proceeding pro se. In his Complaint, he alleges that the Commissioner's final decision was not based upon substantial evidence because "[m]y attorneys did not have the full discloser [sic] of the evidence at hand." (Docket No. 1 at 1.) As indicated above, on September 24, 2008, this Court

26

ordered plaintiff to inform the Court, no later than October 8, 2008, whether he intended to pursue his claim based upon his Complaint, or whether he intended to file a Brief in Support of his Complaint. (Docket No. 15/filed September 24, 2008). On October 3, 2008, plaintiff responded that he intended to pursue his claim and file a Brief. (Docket No. 17). On October 14, 2008, plaintiff submitted a packet of medical records, with the following handwritten notation on the first page of the first medical report: "Judge didn't receive this information at hearing." (Docket No. 18 at 2.)

The thrust of plaintiff's argument to this Court therefore seems to be that remand is necessary to allow the consideration of the medical evidence he submitted on October 14, 2008. The undersigned will address this issue, and will also review the ALJ's credibility and RFC determinations; his decision to dismiss plaintiff's allegation of Lyme Disease for want of a medically determinable impairment; and the sufficiency of the VE's testimony, to determine whether substantial evidence supports the ALJ's decision.

A.  <u>Credibility and RFC Determinations</u>

Residual functional capacity is what a claimant can do despite his limitations. 20 C.F.R. § 404.1545; <u>Lauer v. Apfel</u>, 245 F.3d 700, 703 (8th Cir. 2001). The ALJ must assess a claimant's RFC based upon all relevant, credible evidence in the record, including

27

medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations. Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995); Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); 20 C.F.R. § 404.1545(a). A claimant's RFC is a medical question, and there must be some medical evidence, along with other relevant, credible evidence in the record, to support the ALJ's RFC determination. Id.; Hutsell v. Massanari, 259 F.3d 707, 711-12 (8th Cir. 2001); Lauer, 245 F.3d at 703-04; McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. Hutsell, 259 F.3d at 712. However, although an ALJ must determine the claimant's RFC based upon all relevant evidence, the ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance. Pearsall, 274 F.3d at 1217 (8th Cir. 2001); McKinney, 228 F.3d at 863. The claimant bears the burden of establishing his RFC. Goff, 421 F.3d at 790.

### 1. Credibility Determination

The undersigned will begin with a review of the ALJ's credibility determination. See Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005) (it is clearly established that, before determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility).

The Eighth Circuit has recognized that, due to the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect. Polaski, 739 F.2d at 1321-22. In Polaski, the Eighth Circuit addressed this difficulty and set forth the following standard:

> "The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions."

Id. at 1322.

A claimant's complaints of pain or symptoms "shall not alone be conclusive evidence of disability ... there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques." Travis v. Astrue, 477 F.3d 1037, 1042 (8th Cir. 2007) (citing 42 U.S.C. § 423(d)(5)(A)). An ALJ may not disregard subjective complaints merely because there is no evidence to support them, but may disbelieve such allegations due to "inherent inconsistencies or other circumstances." Id. (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)); see

<u>also</u> <u>Polaski</u>,739 F.2d at 1322.  (although the ALJ may not accept or reject the claimant's subjective complaints based solely upon personal observations, he may discount such complaints if there are inconsistencies in the evidence as a whole.)  The "crucial question" is not whether the claimant experiences symptoms, but whether his credible subjective complaints prevent him from working.  <u>Gregg v. Barnhart</u>, 354 F.3d 710, 713-14 (8th Cir. 2003).  The credibility of a claimant's subjective testimony is primarily for the ALJ, not this Court, to decide, and this Court considers with deference the ALJ's decision on the subject.  <u>Tellez</u>, 403 F.3d at 957.  When an ALJ considers the <u>Polaski</u> factors and discredits a claimant's subjective complaints for a good reason, that decision should be upheld.  <u>Hogan v. Apfel</u>, 239 F.3d 958, 962 (8th Cir. 2001).

In evaluating plaintiff's credibility, the ALJ, having cited <u>Polaski</u>, determined that plaintiff was not fully credible, in part because his activities of daily living were inconsistent with his allegedly extremely limited functional capacity.  The ALJ first noted that plaintiff attended college as late as spring of 2000, and that he also spent a lot of time on his computer in early 2000.  <u>See Forte v. Barnhart</u>, 377 F.3d 892, 896 (8th Cir. 2004) (citing <u>Tennant v. Apfel</u>, 224 F.3d 869, 870 (8th Cir. 2000) (part-time college attendance inconsistent with allegations of disabling pain and fatigue)).

The ALJ also noted that plaintiff testified that he was able to go hunting for small game, prepare meals, and do some yard

work, activities which indicated a good ability to sit, stand, walk, and otherwise function. Indeed, such activities are inconsistent with plaintiff's allegations that he had to spend most of his day resting; that he could walk only two blocks; and could only stand and/or sit for two hours. See Roberson v. Astrue, 481 F.3d 1020, 1025 (8th Cir. 2007)(some driving, fixing simple meals, and doing housework noted to be inconsistent with allegations of total disability); Pelkey v. Barnhart, 433 F.3d 575, 578 (8th Cir. 2006)(performing household chores and doing yard work noted to be inconsistent with allegations of total disability); Neely v. Shalala, 997 F.2d 437, 439 (8th Cir. 1993) (hunting noted to be one factor inconsistent with allegations of total disability).

The ALJ also noted that VA medical records indicated that plaintiff's spinal condition did not warrant surgery, and that the only treatment other than medication shown in the record was a pair of compression stockings to combat plaintiff's edema. Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (claims of disabling symptoms may be discredited when the record reflects minimal or conservative treatment.)

The ALJ also noted that, contrary to plaintiff's testimony that his medication caused "suicidal effects" (Tr. 459), there were repeated notations in the VA records that plaintiff had no suicidal or homicidal ideation. See Hamilton v. Astrue, 518 F.3d 607, 613 (8th Cir. 2008) (ALJ's credibility determination was proper when he noted, inter alia, that plaintiff's testimony was inconsistent with

the evidence of record); see also Polaski, 739 F.2d at 1320 ("Subjective complaints may be discounted if the evidence as a whole is inconsistent with the claimant's testimony.")

Finally, the ALJ noted that plaintiff's earnings record was unimpressive, inasmuch as his annual income never exceeded $4,700.00. A poor work history lessens a claimant's credibility. Woolf, 3 F.3d at 1214; see also Pearsall, 274 F.3d at 1218 (a poor work history "may indicate a lack of motivation to work, rather than a lack of ability.")

A review of the ALJ's credibility determination shows that, in a manner consistent with and required by Polaski, he considered plaintiff's subjective complaints on the basis of the entire record before him, and set forth inconsistencies detracting from plaintiff's credibility. An ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). Because the ALJ considered the Polaski factors and discredited plaintiff's subjective complaints for a good reason, that decision should be upheld. Hogan, 239 F.3d at 962.

2.   RFC Determination

As noted above, the ALJ in this case determined that plaintiff had the residual functional capacity ("RFC") to lift or carry 20 pounds occasionally; sit for six hours in an eight-hour day; stand or walk for six hours in an eight-hour day; occasionally stoop; and follow simple instructions and directions in a routine

work environment.  Substantial evidence supports this decision.

The ALJ thoroughly analyzed the relevant medical evidence and determined that it did not support a finding of disability.  The ALJ noted that a February 1998 mental status examination revealed that, although plaintiff had some psychological symptoms, he was found to be alert and oriented, and to have intact memory, judgment and insight.  The ALJ also noted that an October 1998 VA mental status evaluation showed that plaintiff had some symptoms, but had a generally unremarkable exam and that his mood and affect remained the same.  The ALJ went on to note that a VA mental status examination in November 1998 showed only a slightly abnormal mood and affect, and evaluations in March and September 2000 demonstrated no deficits or abnormalities other than a flat affect on one occasion.  The ALJ further noted that Dr. Matkom, a state agency psychologist who reviewed the record, concluded that plaintiff did not have significant limitations in understanding, remembering or carrying out simple instructions, performing activities within a schedule, making simple work-related decisions, interacting appropriately with others, or responding appropriately to changes in a work setting.

Regarding plaintiff's physical condition, the ALJ noted that an October 1998 x-ray failed to reveal significant pathology, and a January 1999 MRI showed only a small midline bulge at L2-3. The ALJ further noted that a January 1999 electromyogram showed no clear evidence of radiculopathy, and that a VA examination at that time demonstrated that plaintiff had normal strength and intact

sensory ability.  The ALJ also noted that plaintiff's condition was not surgical.  See Loving v. Dept. Of Health and Human Services, 16 F.3d 967, 970 (8th Cir. 1994) (conservative or minimal medical treatment militates against a finding of disability).  The undersigned further notes that the record does not indicate that plaintiff routinely took strong prescription pain medication for back pain.  The lack of strong prescription pain medication supports the ALJ's findings.  See Rankin v. Apfel, 195 F.3d 427, 430 (8th Cir. 1999).

The ALJ also noted that Dr. Khorshidi opined that plaintiff could perform a wide range of medium work during the time period in question, inasmuch as she opined that plaintiff had no manipulative or environmental limitations, and could lift, carry, push or pull fifty pounds occasionally and twenty-five pounds frequently, sit six hours in an eight-hour day, stand or walk a total of six hours in an eight-hour day, occasionally stoop and frequently climb, balance, kneel, crouch and crawl.

The ALJ did not err in dismissing plaintiff's allegation as to Lyme Disease for want of a medically determinable impairment. As the ALJ noted, a June 1996 VA report showed that plaintiff had a negative Lyme titer.  As noted above, during the hearing, the ALJ and plaintiff's attorney discussed the fact that these test results were negative, and plaintiff's attorney did not challenge this interpretation of the results, nor does plaintiff herein advance such a challenge.  The ALJ granted plaintiff's counsel's request to

leave the record open for 14 days, and later extended this to 30 days, to allow the pursuit of medical records confirming a positive diagnosis of Lyme disease.  No such records were ever produced. Furthermore, while the VA medical records contain many physician statements referring to plaintiff's Lyme Disease, such references appear to be based upon plaintiff's self-report to his doctors, and are not supported by references to "medically acceptable clinical and laboratory diagnostic techniques." Hogan, 239 F.3d at 961.

It was not error for the ALJ to fail to credit the physicians' statements that plaintiff had Lyme's Disease, inasmuch as such statements were unsupported.  A physician's statement may be discounted when it is based only on subjective complaints, and when there is no testing to support it. Woolf, 3 F.3d at 1213-14; see also Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986) (per curiam) (physician's opinion must be supported by medically acceptable clinical or diagnostic data).

It was proper for the ALJ to consider the lack of objective medical evidence supporting plaintiff's allegations of disabling psychological and physical conditions.  While the lack of objective medical evidence is not dispositive, it is an important factor, and the ALJ is entitled to consider the fact that there is no objective medical evidence to support the degree of alleged limitations.  20 C.F.R. § 404.1529(c)(2); Kisling v. Chater, 105 F.3d 1255, 1257-58 (8th Cir. 1997); Cruse, 867 F.2d at 1186 (the lack of objective medical evidence to support the degree of severity

of alleged pain is a factor to be considered); <u>Battles</u>, 902 F.2d at 659 (ALJ properly denied benefits to claimant who had no medical evidence indicating a serious impairment during the relevant time); <u>Johnson v. Chater</u>, 87 F.3d 1015, 1017-18 (8th Cir. 1996) (it is proper for an ALJ to consider the lack of reliable medical opinions to support a claimant's allegations of a totally disabling condition; in fact, this was noted to be the "strongest support" in the record for the ALJ's determination).  Moreover, the burden is on the claimant to demonstrate that an impairment is severe, and plaintiff failed to provide any evidence that would support a finding that he had the severe impairment of Lyme Disease.

Even despite the lack of evidence of a test confirming Lyme Disease, the undersigned notes that substantial evidence supports the ALJ's decision.  Medical records dated August 18, 1997 indicate "Lyme Disease - stable" (Tr. 407), and other records consistently document that plaintiff reported doing well, or doing ok.

The ALJ further noted that plaintiff was assigned a GAF of 55, which indicated only moderate difficulty in social or occupational functioning.  <u>See Cox v. Astrue</u>, 495 F.3d 614, 620 n. 5 (8th Cir. 2007) (recognizing that a GAF score of 55 may be associated with a moderate impairment in occupational functioning, citing the American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text revision 2000)).

The undersigned notes that, in cumulation with his findings regarding plaintiff's spine, the ALJ considered plaintiff's obesity. The ALJ noted that, although plaintiff was indeed obese, the only symptom the VA records associated with this condition was a mild degree of lower extremity edema. The ALJ fulfilled his duty to consider any additional and cumulative effects of plaintiff's obesity in conjunction with his analysis of plaintiff's musculoskeletal impairments. <u>See</u> 20 C.F.R. 404, Subpt. P, App. 1, § 1.00(Q).

A review of the ALJ's determination of plaintiff's RFC reveals that he properly exercised his discretion and acted within his statutory authority in evaluating the evidence of record as a whole. The ALJ based his decision on all of the relevant, credible evidence of record, and properly weighed all of the evidence. For the foregoing reasons, the undersigned recommends a finding that the ALJ's disability determination and RFC findings are supported by substantial evidence on the record as a whole.

B.   <u>New Evidence</u>

As discussed above, based upon plaintiff's submissions to this Court, he appears to argue that remand is necessary for consideration of the evidence he submitted to this Court on October 14, 2008. The undersigned disagrees.

Following is a summary of the medical records plaintiff submitted. First submitted were Dr. Wagner's May 21, 1996

Compensation and Pension Exam Report, and Dr. Franczak's September 23, 1996 Compensation and Pension Exam Report. (Docket No. 18 at 8-9; 2-3, respectively.) These materials were included in the Administrative Transcript, and are summarized above.

Plaintiff also submitted VA radiological reports and records dated October 14, 1998; December 17, 1998; September 29, 1999; and January 24, 2005. Id. at 24-26. These records were also part of the Administrative Transcript and are summarized above.

Plaintiff also submitted the October 10, 1996 Compensation and Pension Examination Report of R. Alvarez, Ph.D., which was not part of the Administrative Transcript. Id. at 4. When plaintiff presented to Dr. Alvarez, he denied illnesses except for "possible Lyme disease". (Docket No. 18 at 4.) Plaintiff reported that he was a student at the Fox Valley Technical College, and was considering changing his major from arts and sciences to industrial engineering. Id. Plaintiff reported numbness on his left side which he associated with Lyme Disease. Id. at 5. He reported sleeping with the help of medication. Id.

His major complaint was "short-term memory loss." (Docket No. 18 at 5.) Dr. Alvarez asked plaintiff why, if he had these memory problems, he was considering shifting from an arts and science major to the more demanding curriculum of industrial engineering, and plaintiff explained that he could do many of his engineering courses at home on the computer. Id.

Dr. Alvarez found plaintiff to be of average general

intelligence, and opined that activities requiring the "use of his hands are better done than those demanding verbal abstract reasoning, fund of information, or mental attention and concentration." Id. Plaintiff performed arithmetic operations at a fully average level. Id. at 5-6. Plaintiff showed no disorientation as to time, place or person; was able to recall words from his memory; and his verbal and visual memory were "at least on par with long-term recall." (Docket No. 18 at 6.)

Diagnostic testing revealed a pattern consistent with individuals who present themselves as being physically ill. Id. Dr. Alvarez explained that "[p]hysical symptoms may appear to develop as reactions to mental stress, but the tendency to deny emotional etiology for physical symptoms is pronounced." Id. Dr. Alvarez noted that this mental set was found not only in hysterical somatic complaints, but also in cases in which a diagnosis was later confirmed, and in degenerative illnesses. (Docket No. 18 at 6.) Dr. Alvarez further noted that plaintiff's results accorded with those found in people who were overly sensitive and rigid, and who often felt pressured by the social and vocational aspects of their lives. Id.

Dr. Alvarez diagnosed plaintiff with dysthymia; probable reading disorder; rule out neurological residuals of Lyme disease; and psychosocial stressors. Id. Dr. Alvarez assessed plaintiff's condition as severe, and assigned a GAF of 55. Id. at 7.

Plaintiff also submitted a VA lumbar spine MRI report dated October 27, 1998, which was not found in the Administrative Transcript. Id. at 18. The report revealed a small herniation at L2-3; and marked degenerative changes at L3-4, but the radiologist could not exclude infection. Id.

Plaintiff also submitted VA cervical spine films dated November 23, 1998, which were not found in the Administrative Transcript, and which revealed a straightening of the normal cervical lordosis with slight reversal of the normal curvature, which was likely due to muscle spasm. Id. at 17. The exam was otherwise unremarkable. (Docket No. 18 at 17.)

Plaintiff next submitted VA lumbar spine films dated July 2, 2001, which revealed questionable discitis at the L3-4 level, and suggestion of multilevel degenerative disc disease. Id. at 16.

Plaintiff next submitted a VA MRI report dated August 24, 2001. Id. at 14-15. The impression was that, since 1998, there had been a worsening of degenerative disease at L3-4 and L4-5. (Docket No. 18 at 14-15.)

Plaintiff next submitted VA physical therapy records dated July 8, 2003 indicating that plaintiff presented for physical therapy due to complaints of low back pain. Id. at 10-12.

Plaintiff submitted the June 29, 2006 Mental Impairment Questionnaire completed by Dr. Nittler. Id. at 26-31. Dr. Nittler noted that plaintiff had started treatment on June 27, 2005. Id. at 26. She noted that, during treatment, plaintiff's depression had

mildly improved with Prozac, and that Trazodone helped with sleep; and Methylphenidate helped with fatigue and energy levels. (Docket No. 18 at 26.) Dr. Nittler noted that she was unable to complete an evaluation of plaintiff's ability to function due to the absence of neurological and psychological testing. <u>Id.</u> at 28.

Plaintiff also submitted VA records dated June 20, 2008 detailing plaintiff's evaluation for complaints of limb pain. <u>Id.</u> at 21-23. The examination was normal. <u>Id.</u> at 22.

Finally, plaintiff submitted VA lumbar spine films dated July 7, 2008 which revealed advanced degenerative changes at the L3-4 and L4-5 levels with marked disc space narrowing, sclerosis and osteophyte formation. (Docket No. 18 at 20.)

The Act grants this Court the authority to remand a case to the Commissioner for the consideration of additional evidence, but "only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); <u>Woolf</u>, 3 F.3d at 1215; <u>Chandler v. Secretary of Health and Human Services</u>, 722 F.2d 369, 371 (8th Cir. 1983). "To be material, new evidence must be non-cumulative, relevant, and probative of the claimant's condition for the time period for which benefits were denied, and there must be a reasonable likelihood that it would have changed the Commissioner's determination." <u>Woolf</u>, 3 F.3d at 1215; <u>see</u> <u>also</u> <u>Estes v. Barnhart</u>, 275 F.3d 722, 725 (8th Cir. 2002)(new evidence can support a remand only if there is a reasonable likelihood that the ALJ's decision would have been different had he

considered the evidence.)

The undersigned will address only those materials which were not found in the Administrative Transcript. The relevant time period in this case began on July 25, 1997 and ended December 31, 2000, when plaintiff's insured status expired. Some of the records plaintiff submitted either pre or post-date this period. These materials are the October 10, 1996 Compensation and Pension Exam Report of R. Alvarez, Ph.D.; VA lumbar spine films dated July 2, 2001; a VA MRI report dated August 24, 2001; VA physical therapy records dated July 8, 2003; the Mental Impairment Questionnaire completed by Dr. Nittler on June 29, 2006; VA treatment records dated June 20, 2008; and VA lumbar spine films dated July 7, 2008. See (Docket No. 18.) The threshold issue is whether these records are material; that is, whether they are non-cumulative, relevant, and probative of plaintiff's condition during the relevant time period. See Woolf, 3 F.3d at 1215.

The Eighth Circuit has reached different conclusions about whether medical evidence produced outside the relevant time period is probative of a claimant's condition during the period of insured status. Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007) (comparing Rehder v. Apfel, 205 F.3d 1056, 1061 (8th Cir. 2000) and Basinger, 725 F.2d at 1169.) In Basinger, the plaintiff argued that the ALJ erroneously disregarded the reports of two physicians who had not examined the claimant prior to the expiration of his insured status, but who placed plaintiff's disabling problems within the insured period. Basinger, 725 F.2d at 1169. Having noted that

42

evidence of a claimant's condition after the expiration of the insured status was relevant evidence because it may bear upon the claimant's condition during the insured period, the court concluded that, if a diagnosis was based upon a "medically accepted clinical diagnostic technique," then it must be considered in light of the entire record to determine whether "it establishes the existence of a physical impairment prior to the expiration of the claimant's insured status." Id. (citing Dousewicz v. Harris, 646 F.2d 771, 774 (2d Cir. 1981)). In contrast, the Rehder court, in considering the plaintiff's motion to remand to the Commissioner for consideration of new evidence, specifically noted that a report dated 14 months after the relevant time period was not probative of plaintiff's condition during the period of insured status. Rehder, 205 F.3d at 1061.

In this case, considering Dr. Alvarez's report and the 2001 radiological reports, the undersigned concludes that, even if these records are deemed probative of plaintiff's condition during the relevant time, it is not reasonable to conclude that the ALJ's decision would have changed had he considered them, and they therefore do not support remand.

Dr. Alvarez's report does not support a remand because there is no reasonable likelihood that it would have changed the ALJ's decision. Dr. Alvarez's report does not support a finding of disability, and is in fact consistent with the ALJ's findings. Dr. Alvarez found that plaintiff was generally average, and reported no remarkable findings. He did not opine that plaintiff was unable

to work. Dr. Alvarez found that diagnostic testing revealed a pattern consistent with people for whom physical symptoms develop as a response to stress. Furthermore, Dr. Alvarez's Axis I diagnosis was merely dysthymia, which reflects only a mildly depressed or irritable mood, and which is in fact consistent with the ALJ's finding that plaintiff's suffered from the severe impairment of dysthymic disorder. Because there is no reasonable likelihood that the ALJ's decision would have been different had he considered Dr. Alvarez's report, the report does not support remand. Estes, 275 F.3d at 725; Jones v. Callahan, 122 F.3d 1148, 1152 (8th Cir. 1997).

Nor do the VA radiological studies dated July 2, 2001 and August 24, 2001 support remand. The July report revealed only "questionable discitis" at the L3-L4 level, and a suggestion of multilevel degenerative disc disease. (Docket No. 18 at 16.) The August MRI report revealed a pattern of worsening degenerative disc disease, but "grossly normal" vertebral body height, and revealed that, while a 1998 study revealed a "very shallow disc herniation" at L2-3, this was now merely a "very mild" bulge. Id. at 18. These findings are not inconsistent with the October 1998 and January 1999 x-ray and MRI reports the ALJ reviewed and considered, and do not suggest that plaintiff had a disabling back condition during the relevant time period. Because there is no reasonable likelihood that these radiological reports would have changed the ALJ's decision, they do not support remand. Estes, 275 F.3d at 725; Jones, 122 F.3d at 11522.

The remainder of the materials have a more tenuous relationship with plaintiff's condition during the relevant time, as they more significantly post-date the expiration of plaintiff's insured status. See Rehder, 205 F.3d at 1061. Nevertheless, the undersigned will consider them in light of the entire record to determine whether they contain diagnoses based upon medically accepted clinical diagnostic techniques, or whether they establish the existence of an impairment before plaintiff's insured status expired. See Basinger, 725 F.2d 1169.

The undersigned notes that the July 8, 2003 VA physical therapy record does not reflect a diagnosis which is based upon medically acceptable diagnostic techniques; nor does it reference plaintiff's condition during the relevant period. With regard to Dr. Nittler's June 29, 2006 questionnaire, the undersigned questions whether it is based upon medically acceptable diagnostic techniques, inasmuch as Dr. Nittler indicated that she was unable to satisfactorily evaluate plaintiff due to the "absence of neuro-psych official testing which would help determine [plaintiff's] ability to function." (Docket No. 18 at 28.) Furthermore, Dr. Nittler's report does not bear on plaintiff's condition during the relevant time, inasmuch as Dr. Nittler indicates that plaintiff began treatment on June 27, 2005. The June 20, 2008 VA record merely details plaintiff's evaluation for limb pain and yielded a normal exam, and contains no diagnosis or any information indicating that it related to plaintiff's condition during the relevant time period. Finally, the 2008 lumbar spine films contain no indication that they

have any bearing on plaintiff's condition during the relevant
period.

Plaintiff also submitted the October 27, 1998 and November
23, 1998 radiological reports, which are dated during the relevant
time period. However, neither of these reports support remanding
this case to the Commissioner. New evidence can support a remand
only if there is a reasonable likelihood that the ALJ's decision
would have been different had he considered the evidence. Id.; see
also Estes, 275 F.3d at 725; Jones, 122 F.3d at 1154. As summarized
above, the October 27 report showed only a small herniation at L2-3
and degenerative changes at L3-4, and the November 23 report was
referable to plaintiff's cervical, not lumbar, spine, and were
unremarkable. This evidence does not support remand because there
is no reasonable likelihood that the ALJ's decision would have been
different had he considered it. Id.

For the foregoing reasons, the undersigned determines that
none of the evidence plaintiff submitted to this Court on October
14, 2008 supports remanding this case to the Commissioner.

C.    Vocational Expert Testimony

The ALJ in this case obtained VE testimony to meet his
burden of proving that plaintiff could perform work existing in
substantial numbers in the economy. Review of the record reveals
no error.

"A hypothetical question posed to the vocational expert
is sufficient if it sets forth impairments supported by substantial
evidence in the record and accepted as true by the ALJ." Hunt v.

_Massanari_, 250 F.3d 622, 625 (8th Cir. 2001) (citing _Prosch_, 201 F.3d at 1015).  As explained, _supra_, substantial evidence supports the ALJ's credibility and RFC determinations.  Likewise, his hypothetical question included all the impairments he found to be credible.  See _Strongson_, 361 F.3d at 1072 -1073 (VE's testimony constituted substantial evidence when ALJ based his hypothetical upon a legally sufficient RFC and credibility determination.)  It was permissible for the ALJ to exclude "any alleged impairments that [he] has properly rejected as untrue or unsubstantiated." _Hunt_, 250 F.3d at 625 (citing _Long v. Chater_, 108 F.3d 185, 187 (8th Cir. 1997)).


     Therefore, for all of the foregoing reasons,

     **IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be affirmed, and that plaintiff's Complaint be dismissed with prejudice.

     The parties are advised that they have until **March 16, 2009** to file written objections to this Report and Recommendation. Failure to timely file objections may result in waiver of the right to appeal questions of fact.  _Thompson v. Nix_, 897 F.2d 356, 357 (8th Cir.  1990).


                                   _Frederick R. Buckles_
                                   Frederick R. Buckles
                                   UNITED STATES MAGISTRATE JUDGE


Dated this 4th day of March, 2009.